IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MELVIN KNIGHT,<br><br>                Plaintiff,<br><br>           v.<br><br>JOHN R. WALTON, STEVEN J. CMAR, FLOYD E. MURPHY, BERNARD J. FUNK, JR., KARL D. LEDBETTER, JOSHUA A. KUDLIK, ROBERT CARTY, RONALD J. BURKHART, DONALD RAIRIGH, ROBERT WRIGHT, BRAD V. TOMASELLO, GEORGE LOWTHER, J. WILLIAMS, J. KEENAN, JENNIFER HARR, and KINCAIDY,<br><br>                Defendants. | Civil Action No. 12 – 984<br><br>District Judge David S. Cercone<br><br>Magistrate Judge Lisa Pupo Lenihan |

# REPORT AND RECOMMENDATION

## I. RECOMMENDATION

For the following reasons, it is respectfully recommended that the Motion for Summary Judgment filed by the County Defendants (ECF No. 116) be granted and that the Motion for Summary Judgment filed by Defendant Kincaidy (ECF No. 120) also be granted.

## II. REPORT

Plaintiff, Melvin Knight, initiated this action on July 13, 2012, with the filing of a civil rights Complaint brought pursuant to 42 U.S.C. § 1983. (ECF No. 3.) Plaintiff filed an Amended Complaint (ECF No. 21) on February 21, 2013, and a Second Amended Complaint (ECF No. 36) on June 5, 2013. He alleges violations of his rights under the First, Eighth and Fourteenth Amendments to the United States Constitution.

1

Defendants, who are prison officials and medical personnel at the Westmoreland County Prison ("WCP") in Greensburg, Pennsylvania,[1] filed Motions to Dismiss Plaintiff's Second Amended Complaint, which were granted in part and denied in part by Order of Court dated March 28, 2014. (ECF No. 69.) Pursuant to that Order, only eight of Plaintiff's twenty-four counts survived dismissal.[2] Discovery has concluded and the remaining Defendants have filed Motions for Summary Judgment. (ECF Nos. 116 & 120.) Plaintiff has filed Responses in Opposition to each Motion. (ECF Nos. 130 &131.) The Motions are now ripe for review.

## A. Factual Background

Plaintiff's claims arise out of an encounter with prison officials and medical personnel at the WCP during and following a search of his cell on February 10, 2012. On this day, Plaintiff blocked the security camera in his cell with toilet paper and dimmed the lights by covering them with paper request slips. (Defs.' Ex. A, Deposition of Plaintiff, ECF No. 119-1 at pp.23-27; Ex. M, Video 435-2010 #1; Ex. N, Video.) When Plaintiff did not obey orders to remove the paper, prison officials conducted a search of his cell, which was recorded on video (both handheld and wall mounted security cameras). (Defs.' Ex. A, ECF No. 119-1 at p.23; Ex. M, Video 435-2010 #1; Ex. N, Video.) Unless otherwise noted, the following events are depicted on the video.

The search of Plaintiff's cell started at approximately 20:45 hours (8:45 p.m.). (Defs.' Ex. M, Video 435-2010 #1; Ex. N, Video.) The video begins with officers standing outside of

---

[1] The prison official defendants (collectively referred to herein as "County Defendants") include: John R. Walton (Warden); Steven Cmar (Deputy Warden); and the following prison guards, Floyd Murphy, Bernard Funk, Jr., Karl D. Ledbetter, Joshua A. Kudlik, Robert Carty, Ronald J. Burkhart, Donald Rairigh, Robert Wright, Bard V. Tomasello, George Lowther, J. Williams, and J. Keenan. The medical personnel defendants (collectively referred to herein as "Medical Defendants") include: Jennifer Harr (Nurse) and Sandra Kincaidy (Nurse).

[2] The remaining counts in Plaintiff's Second Amended Complaint involve the following defendants: Murphy, Kudlik, Ledbetter, Carty, Burkhart, Wright, Rairigh, Keenan, and Kincaidy.

Plaintiff's cell getting ready to begin the search. When Plaintiff's cell door opens, Plaintiff is seen kneeling on his bed with his legs shackled and his hands cuffed behind his back. Sgt. Murphy enters the cell, takes Plaintiff by the back of his left arm and leads him to the cell doorway to watch the search. The camera operator, CO Carty, then videos the cell lights and security camera before COs Funk and Ledbetter start to remove the paper that is covering them.

At approximately two minutes and twenty seconds into the video, Plaintiff suddenly makes an aggressive twisting movement and turns his back on Sgt. Murphy, seemingly to tell or complain to the neighboring inmates about what he believes is the destruction of his personal and legal property. While the search appears to be peaceful and calm up to this point, apart from somewhat vulgar and offensive language by Plaintiff, Sgt. Murphy quickly pulls Plaintiff back around by his left arm and takes him into his cell, placing him face down on what appears to be a folded mattress on the bed. Sgt. Murphy is overheard saying, "Don't ever move on me like that again," while he and COs Funk and Kudlik work to restrain and hold Plaintiff on the bed.

At approximately three minutes and three seconds into the video, Plaintiff, who is still on the bed, says, "Are you trying to break my hands now." Sgt. Murphy continues to hold Plaintiff on the bed while the other officers resume the cell search. Plaintiff does not appear to be resisting Sgt. Murphy's hold but continues to complain about the grasp on his wrists.

At approximately five minutes and fifty seconds into the video, the officers behind Plaintiff are seen removing Plaintiff's leg shackles and exchanging them for another pair.

At approximately seven minutes into the video, Plaintiff is lifted off the bed, walked out of his cell and placed into a restraint chair. For approximately three minutes, four to five officers work to strap Plaintiff into the chair. During this time Plaintiff is heard making racially

3

derogatory comments towards the officers and threatening them with lawsuits, but the officers do not engage in conversation with him.

At approximately ten minutes into the video, Plaintiff is removed from the cell area while in the restraint chair and taken to the gymnasium area of the WCP.

At approximately ten minutes and forty-five seconds into the video, Nurse Harr assesses the tightness of Plaintiff's handcuffs and straps on the chair. Nurse Kerry stands beside her while she does this.

At approximately twelve minutes and eleven seconds into the video, the officers and nurses leave the gymnasium.

The first video concludes at twelve minutes and forty-two seconds. At no point in time on the video does Plaintiff complain that he sustained any injuries, and no injuries are visible when he is in the restraint chair.

At the start of the second video, Plaintiff is seen still in the restraint chair in the gymnasium, while an officer works to remove the straps. Several other officers are standing watch, including Sgt. Keenan and CO J. Williams.

At approximately one minute and twenty-five seconds into the video, the officers help lift Plaintiff out of the chair. His hands are still cuffed behind his back and feet still shackled. They then walk him to a bathroom that is in the far corner of the gym. After he is done using the bathroom, Plaintiff walks back to the restraint chair under his own power, not physically accompanied by a guard. An officer straps him back into the chair and then a nurse[3] assesses the tightness of the straps and Plaintiff's handcuffs. The video ends with the officers and nurse leaving the gym at nine minutes and forty-eight seconds.

---

[3] It is believed that this nurse is Nurse Kincaidy.

At the start of the third video, Sgt. Keenan, an unknown officer and an unknown lieutenant are seen removing the straps of the restraint chair. At approximately one minute and thirty-five seconds into the video, the lieutenant helps lift Plaintiff out of the chair and Plaintiff is then walked back to his cell aided by Sgt. Keenan. His leg shackles and handcuffs are removed and the officers leave the cell shutting the door behind them. The video ends at four minutes and five seconds.

At the start of the fourth video, which was recorded on February 29, 2012, Plaintiff is seen walking down the hallway with his leg shackled and hands cuffed behind his back, accompanied by three officers. At approximately one minute and fifty seconds into the video, Plaintiff arrives at the nurse's station to see Nurse Practitioner Belinda and his handcuffs are removed for purposes of the medical exam. He tells the nurse that he has numbness in the top of his left hand from the handcuffs that were on him while he was in the restraint chair. He also tells her that he complained to the nurse that did the fifteen minute checks on him while he was in the chair but she told him the handcuffs were not too tight and his circulation was fine. When Nurse Belinda asks Plaintiff how long he was in the chair, Plaintiff tells her "about four hours." Nurse Belinda then checks Plaintiff's pulse in both hands and examines his left hand for swelling. She tells Plaintiff that "there is really no swelling" but that sometimes handcuffs can cause numbness because "there are a lot of nerves and not a lot of fat in our wrists." She tells Plaintiff what signs to look out for that would indicate a problem and prescribes him Motrin to take twice a day. Plaintiff leaves the medical unit at approximately six minutes and fifteen seconds into the video and is escorted back to his cell. The video ends at eight minutes and fifty-one seconds.

### B. **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir.2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir.2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-61 (3d Cir.1989) (the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance-which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. *See also* Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 381 F. App'x 211, 213 (3d Cir.2010) (quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir.2005)).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must consider the evidence, and all

reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). *See also* El v. SEPTA, 479 F.3d 232, 238 (3d Cir.2007). Importantly, however, in a case such as this one where there is a video recording of the incidents in question, the court need not adopt the non-movant's version of the facts if the recording "blatantly contradict[s]" the non-movant's version "so that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007). Instead, the court should view the facts in the light depicted by the videotape. Id. at 380-81.

Because Plaintiff is proceeding *pro se*, the Court is required to liberally construe his pleadings. Haines v. Kerner, 404 U.S. 519, 520 (1972). Nonetheless, this does not require the Court to credit his "bald assertions" or "legal conclusions." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir.1997). Thus, for example, mere allegations, without support, are insufficient. Rather, the allegations must be supported by evidence, which the Court will evaluate under the standard described above to determine if there is merit beyond mere conclusions.

### C. Discussion

The remaining counts in Plaintiff's Second Amended Complaint involve claims of excessive force, failure to intervene in the use of excessive force, and deliberate indifference to medical/physiological needs.

#### 1. Excessive Force

As discussed in the undersigned's previous Report and Recommendation issued on February 21, 2014, it appears that Plaintiff was a pretrial detainee at the time the events at issue

7

occurred in this case and Plaintiff has not informed us to the contrary.[4] Pretrial detainees are protected from the use of excessive force by the Fourteenth Amendment's Due Process Clause, which prohibits the State from imposing punishment on those who have not yet been convicted of a crime, not the Eighth Amendment's prohibition against cruel and unusual punishment. *See* Ingram v. Wright, 430 U.S. 651, 671 n.40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions"); Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."); Graham v. Connor, 490 U.S. 386, 392 n.6 (1989).

The United States Supreme Court recently distinguished between Eighth and Fourteenth Amendment claims in holding that a pretrial detainee alleging that an officer used excessive force against him in violation of the Fourteenth Amendment need not demonstrate that such officer was subjectively aware that his use of force was unreasonable. *See* Kingsley v. Hendrickson, ___ U.S. ___, 135 S.Ct. 2466, 2472-73 (2015). The Court concluded that a pretrial detainee must show only that the force used against him was objectively unreasonable. Id. The Court said that objective reasonableness "turns on the facts and circumstances of each particular case," id. at 2473 (citing Graham, 490 U.S. at 396), and "a court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. The Court identified several factors relevant in determining whether the force used was excessive. This nonexclusive list includes:

---

[4] Public records indicate that Plaintiff was sentenced on August 31, 2012. *See* Commonwealth v. Knight, Docket No. CP-65-CR-0000851-2010 (Westmoreland Cty. Ct. of Com. Pleas).

> [T]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id.

In announcing this objective standard, the Court recognized that operating a prison is "an inordinately difficult undertaking" and "that the safety and order of these institutions requires the expertise of correctional officers, who must have substantial discretion to devise reasonable solutions to the problems they face." Id. at 2474 (quoting Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510, 1514 (2012)). The Court further explained that "an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a 'clearly established' right, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

As to the first claim of excessive force, Plaintiff alleges that he was assaulted by Sgt. Murphy and CO Kudlik because he complained to the other prisoners that CO Funk and CO Ledbetter were destroying his legal and personal property. (ECF No. 36 at p.3, ¶ 5.) In describing the assault, Plaintiff states that "Murphy violently yanked [his] arm to force him to turn his face toward his cell" and then "Murphy and Kudlik lifted [him] up in the air and carried him into his cell and slammed him face-first onto the metal bunk bed frame in the cell."[5] Id. at ¶¶ 5-6. He further states that "after he was "slammed face-first onto the metal bunk, Murphy grabbed the back of [his] head with his hand and began to slam [his] head against the wall and on the metal edge of the bunkbed numerous times." Id. at ¶ 6. Plaintiff also states that as he was

---

[5] Plaintiff states that "the bunkbed's mattress was thrown onto the floor during the cell search." Id. at ¶ 6.

pinned down, "Murphy took ahold of [his] handcuffed hands and twisted/turned [his] wrists in such a way that [he] wrenched in pain and confusion." Id.; *see also* id. at pp.19-21. He additionally alleges that during the assault "Murphy leaned over [him] and said, 'You murdered that retarded woman nigger.'" Id. at p.4, ¶ 7. According to Plaintiff, he "did nothing to warrant this physical assault" and Murphy acted because [he] complained about the "illegitimate destruction of his legal and personal property." Id. at p.19.

As to the second claim of excessive force, Plaintiff states that the guards applied the straps to the restraint chair in a way that forced his weight to press back upon his injured right wrist causing him pain and that his complaints to the nurses and guards were ignored. Id. at p.14, ¶ 39; pp.23-24.

Simply put, the videotape evidence in this case refutes the majority, if not all of Plaintiff's allegations, and the relevant factors delineated in Kingsley, as they relate to this case, are examined below.

First, the video shows that there was a reasonable relationship between the need for and amount of force used. Force was only used after Plaintiff made a sudden turning movement away from Sgt. Murphy. Once that happened, Sgt. Murphy took control of Plaintiff's left arm, which he was already holding onto, led Plaintiff back into his cell and placed him face down on his bed with his knees on the ground. No other force was used except to hold Plaintiff on the bed and then later to secure him into the restraint chair. While the video shows that Plaintiff made several complaints about his hands during the time he was held down on the bed, the video does not show him yelling or crying out in pain, and there is no indication that any officer twisted Plaintiff's handcuffs or deliberately inflicted pain. There is also no indication that Sgt. Murphy, or any other officer, made racist comments or behaved in an unprofessional manner.

Plaintiff was neither lifted nor carried into his cell, nor was his head slammed against the wall or on the metal bed frame as he alleges. In fact, when Plaintiff viewed the videotape evidence at his deposition, he admitted that the video did not show Sgt. Murphy placing his hand on the back of his head and slamming it against the wall and bedframe. (Ex. A, pp. 126-27, 178-79.) He also could not deny that the video showed a mattress on his bunk and an improvised pillow under his head. Id. at pp. 122-24, 159, 174-75.

Second, the video shows that Sgt. Murphy responded to what he clearly believed to be a real threat. Plaintiff maintains that he was not trying to "head butt" anyone, as Sgt. Murphy stated in his report, and that Sgt. Murphy "over-reacted" to the situation. While that may be so, the force used by Sgt. Murphy was no more than *de minimis* force in an effort to restore order. From an objective point of view, Sgt. Murphy's actions were rationally related to a legitimate nonpunitive governmental purpose and were not excessive in relation to that purpose.

With respect to Plaintiff's second claim of excessive force, the video does not support his allegations that the officers pulled the straps too tight or ignored complains that he was sitting in a manner that caused him physical pain other than the normal discomfort that is to be expected from confinement in a restraint chair.

Plaintiff states that the physical injuries he sustained from the "assault" and his confinement in the restraint chair included cuts and swelling to his head, and pain and numbness in his right wrist. ([ECF No. 36 at p.4](), ¶¶ 9, 11.) The record, however, shows that Plaintiff was medically assessed by nurses at the time he was confined in the restraint chair and medically assessed every fifteen minutes thereafter for the entire period of his confinement. (Defs.' Ex. B, [ECF No. 119-2]().) The nurses did not observe any physical injury and noted that Plaintiff did not complain of any injury. (Defs.' Ex. C, [ECF No. 119-3]().)

11

The video does, however, show that Plaintiff made several complaints about pain in his left hand while he was in the restraint chair. However, the video also shows that nurses inspected the handcuffs for proper tightness and blood flow to Plaintiff's hands.

Even though the WCP nurses noted in Plaintiff's medical chart that he had no physical injuries at the time he was placed in the restraint chair, Plaintiff subsequently reported minimal swelling on his head, numbness in his hand, lacerations on his wrists, and numbness in his left arm. He admits, however, that he was seen by medical personnel following his release from the restraint chair and prescribed a pain reliever for the pain and swelling. (ECF No. 36 at p.5, ¶ 11.) When Plaintiff's hand was examined on February 29, 2012, he was told that his hand numbness symptoms did not correlate with any logical nerve damage. (Defs.' Ex. D, ECF No. 119-4; Ex. M, Video 435-2010 #4.) In response, he revised his numbness symptoms to involve only the crease between his thumb and index finger. Id. Medical staff deemed him a malingerer. Id.

In this case, Plaintiff's alleged injuries are *de minimis*. Even though there was no actual evidence of injury, Plaintiff admitted in his deposition that the numbness and lacerations resolved within sixteen days. (Defs.' Ex. A, pp.96-98.)

Plaintiff also alleges that he suffered "mental and emotional injury" as a result of the incidents on February 10, 2012. (ECF No. 36 at p.16, ¶ 47; p.30.) Specifically, he lists depression, insomnia, headaches, loss of appetite, hopelessness, mood swings and suicidal ideation. Id. at p.16, ¶ 47. However, in his deposition, Plaintiff admitted that his mental disorders existed long before February 10, 2012. He stated that he was diagnosed with mental illness at the age of five and had an extensive history of psychiatric hospitalizations during his childhood. (Defs.' Ex. A, pp.21-26.)

While in his deposition, Plaintiff speculated that his mental health problems were exacerbated by the incidents that occurred on February 10, 2012, such that his medication dosage had to be increased by the prison psychiatrist. However, he admitted that his mental health problems were also exacerbated by of the outcome of his criminal case. Id. at pp.101-05. Further, records show that Plaintiff had suicidal ideations, at least as of April 2010, because of the nature of his criminal case, (Defs.' Ex. E, ECF No. 119-5), and that he requested medication reviews at least nine times before February 10, 2012,[6] because he felt that his medication was not effective (Defs.' Ex. D, ECF No. 119-4).

Viewing the evidence in the light most favorable to Plaintiff, and, where applicable, viewing the evidence of the videotape, as allowed by the Supreme Court, the undersigned finds that it would be impossible for a reasonable fact finder to conclude that any Defendant exerted excessive force upon Plaintiff on February 10, 2012. The force used by Sgt. Murphy and the other officers present and involved in these incidents was objectively reasonable.[7][8] Therefore, summary judgment is appropriate.

---

[6] August 2, 2010; October 25, 2010; December 27, 2010; January 18, 2011; June 1, 2011; July 7, 2011; December 28, 2011; January 10, 2012; and January 17, 2012.

[7] COs Rairigh, Wright and Tomasello were not present at the time Plaintiff's cell was searched and he was being held on his bed. (Ex. A, pp. 66-67, 108-09, 134.)

[8] It is important to note that Plaintiff's claim is that excessive force was used in securing him into the restraint chair, not that the use of the restraint chair itself constituted excessive force and violated his rights under the Due Process Clause as a pretrial detainee. Had it been the latter, it is possible that the claim would have to be analyzed under Hope v. Pelzer, 536 U.S. 730 (2002), where the Supreme Court examined an excessive force claim as applied to mechanical restraints and identified particular criteria relevant to determining whether the use of such restraints constituted cruel and unusual punishment, *as applied to a convicted inmate*. The Hope Court held that (1) where the inmate had "already been subdued, handcuffed, [and] placed in leg irons," and (2) there was a "clear lack of an emergency situation" such that "[a]ny safety concerns had long since abated," then (3) subjecting the inmate to "substantial risk of physical harm" and "unnecessary pain" serves no penological justification. Id. at 738.

### 2. Failure to Intervene

Plaintiff alleges that "[d]uring Murphy's blatant assault upon [him], as [he] was handcuffed behind his back and leg[s] shackled," Defendants Ledbetter, Funk, Kudlik, Carty, Burkhart, Wright and Rairigh "stood by and failed to intervene and stop Murphy from assaulting [him]." (ECF No. 36 at p.4, ¶ 8); *see also* id. at pp.20-21. Plaintiff further alleges that Defendants Funk, Murphy, Ledbetter, Carty, Wright, Burkhart and Rairigh "failed to intervene and stop the unnecessary use of excessive force" when he "was placed in the restraining chair for retaliatory purposes which caused him additional continuous acute pain and injury due to his own weight pressing down upon his already injured right wrist which was cuffed behind his back." (ECF No. 36 at p.24.)

The question of whether these Defendants failed to intervene in the aforementioned alleged acts of excessive force revolves around whether there was an actual underlying excessive force violation. *See* Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation.") For the reasons previously stated, Plaintiff failed to demonstrate an underlying excessive force violation. As such, summary judgment is appropriate.

### 3. Deliberate Indifference to Medical/Physiological Needs

Plaintiff alleges that after he was wheeled into the prison gym area in the restraint chair, he "requested to see medical personnel for the injuries that he had obtained from Murphy." (ECF No. 36 at p.4, ¶ 9.) He further alleges that he told Nurses Harr and Kerry that he had been "assaulted by Murphy" and "was feeling extreme pain to his head and right wrist." Id. He states that Nurse "Harr checked [his] head as he was secured in the restraining chair and determined

14

that he had large swelling to the side of his head in addition to cuts on his head." Id. He also states that Nurse "Harr did not treat his injured right wrist" and that it was "left untreated . . . for more than seven (7) hours as he sat in the restraining chair." Id. at p.5, ¶ 10. Plaintiff further states that during the time he was in the restraint chair, he was not allowed to use the bathroom, drink water or exercise his extremities. Id. at p.23.

Plaintiff brings this claim against Defendant Nurse Kincaidy, whom he alleges was responsible for monitoring him while in the chair and providing him with medical attention; Defendant Keenan, whom he alleges was responsible for procuring his release from the restraint chair in a timely fashion; and Defendant Williams, whom he alleges was responsible for both monitoring him and procuring his timely release from the chair.[9] Id. at p.14, ¶ 40.

As an initial matter, Plaintiff maintains that he was in the restraint chair for more than seven hours, and he knows this because when he was released he asked a nurse for the time and she showed him her wristwatch and replied that it was 4:30 a.m. Id. at p.9, ¶¶ 24, 41. He also states that WCP record logs were "intentionally manipulated" to show that he was in the chair for only four hours. Id. at p.15, ¶ 42.

Plaintiff's contention is refuted not only by the record, but by his own admission that was obtained on videotape while he was in the medical unit on February 29, 2012. In that video, Plaintiff is overheard telling the nurse that he was in the restraint chair for "about four hours",

---

[9] Plaintiff also brought a deliberate indifference to medical needs claim against Nurse Harr, but it was dismissed for failure to state a claim on March 28, 2014. (ECF No. 69.) Additionally, Plaintiff's deliberate indifference claim against Defendant J. Williams was dismissed for failure to prosecute because Plaintiff had failed to timely serve him with the complaint within 120 days as contemplated under Federal Rule of Civil Procedure 4(m), and his whereabouts were unknown. See ECF No. 66, at p.23. However, the Court should enter summary judgment in his favor *sua sponte* because the record refutes any possible claim that Defendant Williams was deliberately indifferent to Plaintiff's medical or physiological needs while Plaintiff was in the restraint chair. See Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); see also Gibson v. Mayor & Council of Wilmington, 355 F.3d 215, 222, 224 (3d Cir. 2006).

15

and this amount of time is corroborated by WCP records, which indicate that Plaintiff entered the restraint chair at 9:05 p.m. and was removed from the chair at 1:00 a.m. (Defs' Ex. B, ECF No. 119-2.) Furthermore, the videotape evidence does not support Plaintiff's statement that he asked a nurse what time it was when he was released from the restraint chair. The videotape clearly shows three officers unstrapping Plaintiff from the chair and walking with him the short distance back to his cell. There is no nurse present and Plaintiff does not ask anyone who is present for the time.

Plaintiff's allegation that he was not allowed to use the bathroom or exercise his extremities is also clearly refuted by the videotape evidence, which shows that Plaintiff was released from the chair to walk around the gym and use the bathroom.

Finally, Plaintiff's complaints about the lack of medical attention he received while in the chair are also rebutted by the videotape evidence and by his own testimony during his deposition. Plaintiff admits, and the video shows, that Nurse Kerry did an assessment of proper circulation and tightness of the straps and shackles after he was initially secured in the chair. (Defs' App. B, ECF No. 114-2.) As part of this examination, Plaintiff admitted that the nurses placed their fingers between the cuffs and the skin to ensure there was proper room. (Defs' App. D, ECF No. 114-4; App. E, ECF No. 114-5.) He also admitted that he heard Nurse Kerry say that he was appropriately placed in the chair to where there wasn't a health risk. (Defs' App. E, ECF No. 114-5.) Plaintiff states that Nurse Kincaidy examined him approximately fifteen or twenty minutes after he was initially placed in the restraint chair. Id. He claims that he told her that he could not feel his hands, but that she did the same assessment as Nurse Kerry and told him that his circulation was fine. Id. When asked in his deposition if Nurse Kincaidy every refused to provide him care, Plaintiff answered no. (Defs' App. L, ECF No. 114-12.) When asked whether

16

he ever asked her to provide him with medical care, Plaintiff answered that he did one time but it was not until about five days after he was released from the chair. Id. Plaintiff admitted that he saw Nurse Belinda, was prescribed Ibuprofen/Motrin for his pain, that the swelling subsided within approximately ten days, and that the numbness resolved within sixteen days. (Defs' App. F, ECF No. 114-6.)

As noted with respect to Plaintiff's excessive force claims, the Supreme Court has recently called into question whether it is appropriate to borrow the Eighth Amendment standard when the claim is brought by a pretrial detainee, not a convicted prisoner, and whether the Due Process Clause may afford greater protection than the Eighth Amendment. *See* Kingsley, *supra.* However, the court need not resolve this issue because it appears there would be little practical difference between whether a pretrial detainee's medical needs claim is examined under a test akin to that in Kingsley or the deliberate indifference standard from the Eighth Amendment. Furthermore, the current state of the law in this Circuit is for courts to apply the Eighth Amendment deliberate indifference standard to claims of inadequate medical care brought by pretrial detainees. *See* Lenhart v. Pennsylvania, No. 13-1173, 2013 U.S. App. LEXIS 11723, 2013 WL 2479409 (3d Cir. June 11, 2013) ("[A] pretrial detainee is not entitled to Eighth Amendment protections, but nevertheless a pretrial detainee's claim of inadequate medical care is evaluated under the same standard as a convicted prisoner's Eighth Amendment claim of inadequate medical care[.]") (citing Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003)).

The videotape evidence blatantly contradicts Plaintiff's allegations that the Defendants were deliberately indifferent to his physiological needs, and the record refutes that he was denied medical care. In fact, it appears that Plaintiff was prescribed Ibuprofen/Motrin for injuries that

17

medical personnel did not even believe existed and he admitted that these injuries resolved within no more than sixteen days. Plaintiff does not even state what medical care he did not receive that he believes was necessary. It appears that Plaintiff was simply dissatisfied with the course of treatment that he was provided, which does not even state a claim for deliberate indifference. *See* White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). For these reasons, summary judgment should be granted.

### 4. **Mental and Emotional Injury**

Plaintiff brings forth a separate claim for mental and emotional injury. With respect to this type of injury, federal law provides that

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act.

42 U.S.C. § 1997e(e). The Third Circuit has analyzed the physical injury requirement in § 1997e(e) to require more than a *de minimis* physical injury. Mitchell v. Horn, 318 F.3d 523, 535 (3d Cir. 2003). In Mitchell, the Third Circuit stated:

> We believe that reading 1997e(e) to allow a plaintiff to allege any physical injury, no matter how minor, would produce an unintended (indeed absurd) result. Were we not to read 1997e(e) as requiring more than a de minimis physical injury, we would turn its physical injury prerequisite into a mere pleading requirement, thereby rendering the requirement meaningless as a practical matter. . . . We therefore follow the approach of the Fifth, Ninth, and Eleventh Circuits in requiring a less-than-significant-but-more-than-de-minimis physical injury as a predicate to allegations of emotional injury.

Id. at 535-36.

The WCP medical records and videotape evidence do not support Plaintiff's physical injury allegations. Nevertheless, Plaintiff admits that the injuries he allegedly sustained resolved within sixteen days or less and that no treatment was required beyond a pain reliever. These

18

injuries, if they existed at all, were *de minimis*; and, as such, his claim for mental and emotional injury is barred by 42 U.S.C. § 1997e(e).

III. **CONCLUSION**

For the foregoing reasons, it is respectfully recommended that the Motion for Summary Judgment filed by the County Defendants (ECF No. 116) be granted and that the Motion for Summary Judgment filed by Defendant Kincaidy (ECF No. 120) also be granted.

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated: September 24, 2015.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc: Melvin Knight
KR 9608
SCI Greene
175 Progress Drive
Waynesburg, PA 15370

Counsel of Record
*Via CM/ECF Electronic Mail*